IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DESHAWN GARDNER,

    Plaintiff,

v.

WEXFORD HEALTH SOURCE,
STEPHEN DUNCAN, JOHN COE, and
SHERRY COLLINS,

    Defendants.

Case No. 3:19-cv-00017-SMY

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Deshawn Gardner filed the instant lawsuit pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights at Lawrence Correctional Center. He is proceeding on claims against Defendants Stephen Duncan, John Coe, and Sherry Collins for deliberate indifference to his knee injury in violation of the Eighth Amendment (Count 1), and against Wexford Health Source for maintaining cost reducing policies that limited available care (Count 2).

This matter is now before the Court on Defendants' Motions for Summary Judgment (Docs. 138, 140). Plaintiff filed responses in opposition to the motions (Docs. 142, 143) and Defendants filed a reply (Doc. 148).

### Facts[1]

Plaintiff Deshawn Gardner has been incarcerated at Lawrence Correctional Center since December 2013 and was at Lawrence for all events relevant to this lawsuit. (Doc. 141-2, Deposition of Deshawn Gardner, p. 8:21-5-9:4). Defendant Stephen Duncan was the Warden of

---

[1] The facts are undisputed unless otherwise noted.

Lawrence from 2014 until his retirement in August of 2016. (Doc. 139-2, Deposition of Stephen Duncan, p. 14:14; 69:17-18). Defendant John Coe is a physician and was the site medical director at Lawrence from 2013 through August of 2016. (Doc. 141-3, Deposition of Dr. John Coe, p. 26:1). Defendant Sherry Collins was a licensed practical nurse for IDOC from 2001 until 2020 and worked at Lawrence in 2015 and 2016. (Doc. 141-2, Deposition of Sherry Collins, p. 22:20-22; 24: 17-19). Defendant Wexford Health Source is a medical company that contracts with IDOC to provide medical care for inmates.

Gardner did not have routine medical visits from January 2014 through August or September of 2016, but nurses did pass his administrative detention cell every day to see other inmates. (Doc. 141-1, p. 20:17-24; 21:1-2; 23:12-18). To place a sick call request, he filled out a form and placed it in his door for an officer to pick up. (*Id.*, p. 24:8-11).

In November or December 2015[2], Gardner injured his knee as he stretched before a run. (Doc. 141-1, 32:22-33:13). His knee popped audibly "like a rubber band was breaking." (*Id.*, p. 33:12-13). After his knee popped, Gardner had difficulty putting weight on his left leg. His kneecap would lock out of place and he would have to kick to unlock it to put weight on it. (*Id.*, p. 33:16-24:13). Gardner did not immediately seek medical attention because he did not realize it was a serious injury. (*Id.*, p. 24:19-21).

The first week or so after the injury, the stiffness subsided, and Gardner noticed a throbbing pain. (*Id.*, p. 35:5-7; 35:10-17). Initially, the pain was a 4 on a scale of 1 to 10. (*Id.*, p. 36:1-7). Gardner's knee hurt when he walked, performed routine chores, or slept. (*Id.*, p. 35:12-14; 36:1-7; 36:18-21). He noticed his knee locking in February 2016, and the noises his knee made got louder over time. (*Id.*, p. 37:7-11; 37:16-21). By the time Gardner sought care, his knee was

---

[2] Nurse Collins documented that Gardner's injury occurred in August or September of 2015. This discrepancy does not impact the analysis of the claims in this case. (Doc. 141-5, p. 5).

locking frequently. (*Id.*, p. 38:1-4).

Gardner testified that he began submitting sick call slips concerning his knee in February 2016, but neither Dr. Coe nor Nurse Collins was aware of any such requests.[3] (Doc. 141-1, p. 42:12). They both testified that sick call slips or requests directed to a nurse were supposed to result in an appointment with a nurse being scheduled within 24 hours subject to holidays and weekends. (Doc. 141-2, p. 61:20-24; Doc. 141-3, p. 72:11-17).

Collins knew Gardner from interactions prior to her first assessment of his knee, and believed they had a good rapport. (Collins Dep., Doc. 141-2, p. 125:15-126:11). Gardner first saw Collins for his knee on April 23, 2016, at which time he reported pain that was a 10 on a scale of 1 to 10. According to Gardner, Collins rolled her eyes and expressed disagreement with his expressed level of pain because he walked into the exam room without trouble. (Doc. 141-1, p. 27:15-24; 39:6-10). Collins testified that she did not believe that Gardner's physical presentation was consistent with his report of pain at a level 10. (Doc. 141-2, p. 135:1-3). She documented "his alignment in his knee was good. There was no swelling, no discoloration, skin integrity was intact. Circulation he had good pulses, capillary refill within normal limits, and good pulses in the knee[.]" (*Id.*, p. 163:4-8). She observed him "doing all of his normal exercise routine" on the yard, and she observed no visible signs of injury on his knee. (*Id.*, p. 127:2-4; 133:2-8).

Gardner testified that Collins did not conduct the same type of exam as doctors he saw subsequently, and he was forced to demonstrate a range of motion himself to prove that his knee made audible noises. (Doc. 141-1, p. 28:11-24). He stated in a later grievance that "she then examined my knee by touching all around it." (Doc. 139-4, p. 3).

---

[3] In his original grievance, Plaintiff alleged that he submitted a sick call slip on April 11, 2016, about his knee. (Doc. 139-4, p. 2). However, in an August 2016 grievance he alleged that he had been complaining about his injury since February of 2016. (*Id.*, p. 14). There is no record evidence of efforts starting in February 2016, and the Defendants do not concede or contest this assertion.

Collins suggested Tylenol or Ibuprofen and six weeks of rest. (Doc. 141-2, p. 40:13-15). Gardner informed her that he already had Tylenol in his cell but it did not help, and that he had stayed off of his knee since he injured it to no avail. (Doc. 141-1, p. 40:18-24). It is undisputed that the appointment ended in a verbal dispute, which resulted in Gardner being removed to his cell. Gardner admitted that he cursed at Collins, though he did not recall the exact contents of the verbal exchange. (Doc. 141-1, 43:12-19). He did not ultimately receive medication from Collins. (*Id.*, p. 19-22).

Collins testified that she did not have independent authority to order an x-ray, and was not involved in the decision to order an MRI. (Collins Dep., Doc. 141-2, p. 93:1-4). She also testified that she had nothing to do with the cost of care, and did not believe decisions were made based on cost. (*Id.*, 89:10-13; 90:14-16).

After the first appointment, Gardner submitted a grievance on May 5, 2016, complaining that he had not received adequate care for a knee injury. (Doc. 139-4, Grievance documents, p. 2-4). A memo from the healthcare unit dated May 25, 2016 indicates that Gardner had been seen by a doctor and had received "community standards of care." (*Id.*, p. 15). Based on the information from the healthcare unit, the grievance officer recommended denial of the grievance. Defendant Duncan concurred on June 27, 2016. (*Id.*, p. 1).

Gardner saw Collins for knee pain a second time on May 21, 2016, and again reported pain at a level of 10. (Doc. 141-1, p. 45:2-4; 45:19-24). During this appointment, he reported and demonstrated the same issues with his knee popping and locking and again requested an MRI. (*Id.*, p. 45:14-46:5; 47:14-15). Collins documented that Gardner demonstrated various ranges of motion which produced audible popping and minimal grinding. (Doc. 141-5, p. 5). She recommended Tylenol or Ibuprofen but Gardner refused because it did not help. (*Id.*, p. 48:10-

13). Collins scheduled Gardner to see the doctor to further address his knee issues. (*Id.*, p. 48:7-9). The appointment lasted approximately four minutes. (*Id.*, p. 48:16).

Gardner testified that Dr. Coe examined his knee on May 24, 2016 and determined that he had tear. He refused an MRI and instead offered muscle cream and a knee sleeve. (Doc. 141-1, p. 30:5-23; 48:21-23; 50:4-51:19). Dr. Coe performed an exam that included bending and twisting Gardner's knee in various positions. (*Id.*, p. 49:16-22). Dr. Coe recorded in the medical records that "both knees have full range of motion. He has laxity equally in the lateral collateral ligament. The left knee will hurt with tension in the lateral collateral ligament at its proximal insertion area. He has tenderness in a limited quarter sized area along the lateral femoral epicondyle. OX—old knee sprain with scarred and damaged lateral ligament." (Doc. 141-5, p. 7). Gardner testified that, "Dr. Coe told me that I failed to report my injury in a timely manner and he not giving me no MRI on an old knee injury." (Doc. 141-1, p. 50:14-16). Gardner got the muscle cream, but never received the knee sleeve. (*Id.*, 32:12-14; 51:4).

Dr. Coe testified that at the time his original assessment on May 24, 2016, he documented a full range of motion, tenderness in Gardner's lateral collateral ligament, and overall stability of the joint. (Doc. 141-3, p. 111:3-16). Based on his assessment, he believed Gardner had an old knee sprain above the knee that could be treated with topical balm and a knee sleeve. (*Id.*, p. 111:3-22). He could order an x-ray without collegial review. (*Id.*, p. 91:16-18). He did not believe an MRI or x-ray would be beneficial at that time because he believed that a torn or damaged ligament could be treated with physical therapy if the patient presented the issue within a week or two, or at minimum three to four months, but if they waited longer to seek care scar tissue would already have formed. (*Id.*, p. 120:6-121:1). He testified that he did not consider costs when he made treatment decisions. (*Id.*, p. 87:3-16).

Gardner alleges that after the appointment with Dr. Coe, he spoke to Defendant Duncan three times about his need for treatment. During the first conversation on June 11, 2016, Duncan said he would look into it. (Doc. 143-3, Gardner's Declaration, ¶¶ 2-3). He spoke to Duncan after that on the yard and restated his concerns, and again spoke to Duncan on July 9, 2016 about his continued need for care. (*Id*., ¶¶ 4-7). Gardner claims that Duncan indicated he would follow-up on his care, but he never heard further from him. (*Id.*, ¶¶ 3, 5, 7).

Duncan testified that he remembered one conversation and agreed that he told Gardner he would follow-up with Dr. Coe. (Doc. 139-2, Deposition of Stephen Duncan, p. 66:11-12). He did not specifically recall the other conversations, although he indicated he may have followed-up with Gardner. (*Id.*, p. 67:20; 73:13-23).

Gardner testified that his knee locked on July 29, 2016, as officers escorted him to yard. (Doc. 141-1, p. 52:3-9). He was unable to pop his knee into place or to fully straighten his leg, so he was escorted to the medical unit by wheelchair. (*Id.*, p. 52:20-21; 53:8-9). The nurse's notes from this date indicate that Gardner's knee fully locked up when he was walking backwards, and he reported he was unable to fully extend it. (Doc. 141-5, p. 9). According to the notes, Gardner's knee had normal anatomical alignment, there was no swelling or discoloration, and his pulse and circulation were normal. He reported pain on movement. (*Id.*).

Gardner testified that Dr. Coe examined his knee in the medical unit on July 29, 2016 and that he grabbed his ankle and knee and pushed on his leg, which caused great pain. (Doc. 141-1, p. 54:1-8). Gardner begged for an MRI, but Dr. Coe refused further care and instructed correctional staff to remove Gardner from the medical unit. (*Id.*, p. 54:18-24). Documents from July 29, 2016, indicate that Dr. Coe saw Gardner that day. (Doc. 141-5, p. 10). Dr. Coe testified that he had very limited recollection about the encounter. He described it as "on the fly because

at the time I might have 30 patients to see that already had appointments" and recalls that he recommended an official appointment for Gardner during the next nurse sick call. (Doc. 141-3, p. 157:23-158:3).

Gardner declared a hunger strike as he was being returned to his cell on July 29, 2016. (Doc. 141-1, p. 55:16-17).  On August 1, 2016, Dr. Coe examined Gardner related to the hunger strike, but did not further assess his knee. (*Id.*, p. 57:21-23; 58:2-5; 58:20).

Gardner's knee was next examined on August 5, 2016 by Dr. Matticks (a non-party). (Doc. 141-1, p. 60:5-15).  Dr. Matticks performed the same bending and twisting exam as Dr. Coe and concluded that Gardner either had a meniscus tear or an MCC effusion that could only be diagnosed more specifically by MRI. (*Id.*, p. 61:1-5; 61:8-10).  An x-ray taken of Gardner's knee on August 5, 2016 showed a hairline fracture of the patella.  Gardner was placed in the infirmary with crutches and Tylenol 3. (*Id.*, p. 63:16-64:1).[4]  An MRI was performed on August 9, 2016, after which Gardner was moved back to segregation with a low-bunk, low-gallery permit. (Doc. 141-1, p. 67:13-17).

Dr. Gurtler (a non-party outside specialist) diagnosed Gardner's knee problem as a meniscus tear, which was stuck inside his joint and prevented him from extending his knee fully. (Doc. 141-1, p. 68:9-12).  He also noted a cyst and an MCC effusion (*Id.*, p. 68:13-15) and recommended surgery to remove the torn meniscus.  The surgery was performed on October 31, 2016. (*Id.*, p. 68:19-23; 69:11). Following surgery, Gardner completed a course of physical therapy at Lawrence. (*Id.*, p. 71:23-72:2).

Gardner testified, "I still have problem with the knee right now today.  I take Ibuprofen 800 because she said it's fluid, but the knee starting—it pops and it hurts periodically." (*Id.*, p.

---

[4] Gardner continued his hunger strike because he was unsure if he would receive the MRI. (*Id.*, p. 62:5-8; 62:15-20).

72:14-17). He also testified that he can walk, but he cannot run anymore. (*Id.*, p. 75:3-6) and that his pain improved greatly after surgery, but still comes and goes. (*Id.,* p. 80:19-81:3).

### ***Expert Testimony and Reports***

Gardner's expert, Dr. Cole, opines that Nurse Collins failed to conduct an exam on April 23, 2016 that was consistent with the symptoms identified by Gardner. (Doc. 141-6, Cole Deposition, p. 22:10-13). In his opinion, when presented with subjective complaints of painful locking, any reasonable provider should acknowledge that imaging or a physical exam would be required to more specifically diagnose an injury. (*Id.*, p. 58:13-59:3).

Dr. Cole offers the following opinions regarding the care provided by Dr. Coe: Dr. Coe did not perform the correct type of examination to detect a meniscus tear, and that the exam performed was not relevant to the symptoms Gardner reported (Doc. 141-6, p. 32:7-18); Dr. Coe's physical exam and diagnosis were not consistent with the physical symptoms reported by Gardner (*Id.*, p. 64:2-11; 65:10-19); bucket handle meniscus tears can be asymptomatic (*Id.*, p. 33:10-13); if a patient's knee is not locked at the time of an exam, the condition is not emergent (*Id.*, p. 39:13-14); if a meniscus tear is repaired, the risk of arthritis is typically less than ten percent, but if a meniscus is removed the risk of arthritis is fifty percent (Doc. 141-6, p. 53:4-9).

Defendants' expert, Dr. Nogalski, testified that "it would be reasonable [for a nurse] to provide some form of medication, period of observation, and you know that you have that patient available for follow-up…if these simple measures are not working." (Doc. 141-8, Dr. Nogalski Deposition, p. 207:24;208:5). In his opinion: Dr. Coe's assessment and treatment was reasonable for a general practitioner; individuals with injuries similar to Gardner's often go a long time without symptoms or without reporting their injury; the surgical outcome would not have been any different regardless of the timing of treatment (Doc. 141-8, p. 206:5-19; 55:14-16; 60:5-10); the

configuration of the tear was in the non-repairable zone; and "in patients who are 45, the tissue quality is not optimal so there [is] some internal degeneration of meniscal tissue." (Doc. 141-8, p. 73, 60:5-10).

## DISCUSSION

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED. R. CIV. P. 56(a)). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, the Court views the evidence "in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences, and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014). It may not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010).

### Count 1 – Eighth Amendment claim

#### *Defendants Dr. Coe and Nurse Collins*

Prison officials and medical staff violate the Eighth Amendment's prohibition against cruel and unusual punishment when they act with deliberate indifference to a prisoner's serious medical needs. *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017). To prevail on an Eighth Amendment claim of constitutionally-deficient medical care, a prisoner must establish that he had an objectively serious medical need and that the defendant had knowledge of facts from which he or she could infer that a substantial risk of serious harm exists associated with that medical need, but

nevertheless, disregards that risk. *Id.* at 476. Here, Defendants do not explicitly dispute that Gardner suffered from an objectively serious medical condition. In any event, the record of Gardner's persistent complaints of pain and symptoms establishes the same. Thus, the question is whether there is evidence in the record from which a jury could reasonably find that Defendants were deliberately indifferent to Gardner's medical needs.

An inmate is not required to show that he was literally ignored by prison staff to demonstrate deliberate indifference. *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). If a risk from a course of medical treatment, or lack thereof, is obvious, a factfinder can infer that a defendant knew about it and disregarded it. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Such circumstances may include ignoring a request for treatment, substantially departing from accepted professional standards, persisting with an ineffective course of treatment, or inexplicably delaying treatment. *Id.* at 729.

This case involves reliable, but competing, expert opinions about whether the care in question substantially departed from accepted professional standards. Additionally, there is evidence in the record from which the jury could conclude that Dr. Coe disregarded the risk to Gardner by ignoring his requests for an MRI to diagnose his condition and persisting with an ineffective course of treatment. As such, summary judgment is inappropriate and will be denied on Count 1 with respect to Defendants Dr. Coe and Nurse Collins.

### *Defendant Duncan*

A prison administrator may only be held responsible for deliberate indifference to a medical condition if he or she "knows about unconstitutional conduct and facilitates, approves, condones, or 'turn[s] a blind eye to it." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). An official may reasonably rely on the judgment of medical officials in his or her investigation of a

complaint about medical care. *Giles v. Godinez*, 914 F.3d 1040, 1049-50 (7th Cir. 2019). And the denial of a grievance by persons who did not participate in the underlying conduct is not sufficient to state a claim. *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011). Likewise, a refusal to deem a grievance an emergency is not sufficient to state a claim for deliberate indifference. *See, e.g., Brown v. Wexford Health Sources, Inc.*, 2014 WL 257552 (N.D. Ill. 2014).

Gardner's May 5, 2016 grievance was received in the grievance office on June 21, 2016. On June 27, 2016, the warden concurred with the finding that Gardner's concerns about his knee injury had been treated because he was seen by Dr. Coe on May 24, 2016 (after the filing of the grievance). Duncan cannot be found to have been deliberately indifferent for relying on the response of the medical officials about this grievance.

Gardner also claims to have had three conversations with Duncan about his knee injury and his desire for more comprehensive care. Duncan testified that he remembers one conversation and that he asked Dr. Coe to investigate it. He does not recall other conversations, but does not dispute that they happened.

Although prison administrators may defer to the judgment of treating providers, a jury could reasonably find that Duncan's reliance on medical professionals was not reasonable when he took it upon himself to further investigate Gardner's care and given the additional conversations alleged by Gardner. Accordingly, summary judgment with respect to Gardner's claim against Duncan in Count 1 will be denied as well.

### Count 2 – Monell Liability by Wexford

A prison's medical contractor can be held liable under § 1983 for unconstitutional policies or widespread practices that cause a constitutional injury.[5] *Glisson v. Indiana Dep't of Corr.*, 849

---

[5] In *Monell v. Dept. of Social Services of the City of New York*, the Supreme Court held that a municipality may be liable under § 1983 for constitutional violations resulting from a policy or custom of the municipality. 436 U.S. 658,

F.3d 372, 378–79 (7th Cir. 2017). Gardner contends that his injuries were the product of customs and policies by Wexford of refusing or delaying treatment to cut costs. To prevail on his claim, he must prove the existence an actual policy or custom that caused the constitutional injury – meaning the custom or policy must have been the "moving force" behind the injury – and that Wexford policymakers were deliberately indifferent to the known or obvious risk that the policy would lead to constitutional violations. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020).

To support his *Monell* claim, Gardner refers to a Wexford corporate handbook that instructs providers to offer medical care "at the best possible price." (Doc. 142-5, p. 10). But the statement "at the best price possible," does not necessarily imply cutting corners to the extent that an inmate is afforded constitutionally deficient care. Moreover, Gardner fails to establish a causal link between the policy and his experience. Both Dr. Coe and Nurse Collins testified that they did not make treatment decisions based on cost, and that cost would not have prevented him from receiving an MRI. (Doc. 141-2, 89:10-18; Doc. 141-3, 87:3-16). Because there is no evidence to refute this testimony, Gardner cannot prove that any policy related to cost caused him harm. Accordingly, Wexford is entitled to summary judgment on Count 2.

## DISPOSITION

For the reasons stated, Defendant Duncan's Motion for Summary Judgment (Doc. 138) is **DENIED**. The medical defendants' Motion for Summary Judgment (Doc. 140) is **GRANTED** as to Count 2 against Defendant Wexford Health Sources and **DENIED** as to Count 1 against Defendants Dr. Coe and Nurse Collins. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Wexford at the close of this case. This case will be set for a status conference to set a firm trial date.

---

690–91 (1978). The Seventh Circuit has extended *Monell* beyond municipalities to include private corporations providing government services, such as Wexford. *Shields v. Illinois Dept. of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014).

**IT IS SO ORDERED.**

**DATED: March 27, 2023**

*s/ Staci M. Yandle*
**STACI M. YANDLE**
**United States District Judge**
